**Herbert R. GARRISON, Jr., Individually, and as Executor of the Estate of Herbert R. Garrison and Faye J. Mills as next friend of Kristen Lynne Garrison, a Minor and Kimberly Lynne Garrison, a Minor, Plaintiffs,**

v.

**MOLLERS NORTH AMERICA, INC., a Delaware Corporation, Moellers Mashinenfabrik Gmbh U. Co., a West German Corporation, Defendants.**

Civ. A. No. 89–597–JLL.

United States District Court, D. Delaware.

April 21, 1993.

Donald L. Gouge, Jr., Heiman, Aber and Goldlust, Wilmington, DE, and Peter M. Patton, Galfand, Berger, Lurie, Brigham & March, Philadelphia, PA, of counsel, for plaintiffs.

Francis J. Murphy, and Carolee Burton Kunz, Murphy & Welch, Wilmington, DE, and Peter R. Engelhardt, Summit, NJ, of counsel, for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. *INTRODUCTION*

On October 27, 1989, plaintiff Herbert R. Garrison, Jr., in his individual capacity and in

his capacity as executor on behalf of the estate of his late father Herbert R. Garrison, Sr., and plaintiff Faye J. Mills, in her capacity as next friend on behalf of her minor daughters, Kristen Lynne Garrison and Kimberly Lynne Garrison, brought this wrongful death action against defendants, Mollers North America ("Mollers NA") and Moellers Maschinenfabrik GMBH U. Co. ("Moellers Germany").[1] (D.I. 1.) The decedent, Herbert R. Garrison, Sr., was employed by the General Chemical Corporation as an electrical specialist in the maintenance department at the company's plant in Claymont, Delaware. On November 11, 1987, the plant foreman, Mr. Paul Gerdeman, asked the decedent to examine the Mollers PFS palletizer.[2] Although the palletizer was performing its task, the slip sheet placer mechanism was moving erratically. Initially, the decedent observed the operation of the palletizer from a safe distance in an attempt to diagnose the problem. After studying the palletizer for a few moments, the decedent placed his head into the palletizer beneath its large metal arms to obtain a better view of the slip sheet placer. The palletizer was still energized. The arms of the palletizer descended, struck the decedent, and killed him.

The case was tried before a jury from January 11, 1993 to January 13, 1993. The jury returned a general verdict, accompanied by answers to interrogatories, on behalf of the plaintiffs. (D.I. 103.) Specifically, the jury found that the plaintiffs had suffered $937,500.00 in compensatory damages and further found the defendants 75% negligent and the decedent 25% comparatively negligent. *Id.* Thereafter, the Court pursuant to Federal Rule of Civil Procedure 58 entered a judgment against defendants in the amount of $703,125.00, reducing the $937,500 of compensatory damages found by the jury by 25% to account for the comparative negligence of the decedent. (D.I. 106.)

The defendants have moved pursuant to Federal Rule of Civil Procedure 50 for a judgment as a matter of law, or, alternatively, for a new trial or remittitur. (D.I. 108.) The Court will discuss these alternative requests *seriatim.*

## II. DISCUSSION

### A. DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

A post-verdict motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure contests the sufficiency of the evidence in support of the jury's verdict. A question as to the sufficiency of the evidence concerns the allocation of functions between judge and jury, and is thus procedural. In essence, the Rule 50(b) motion requests that the reviewing court enter judgment as a matter of law in favor of the movant because there is insufficient evidence for a reasonable jury to have found to the contrary, and therefore, the trial court should not have submitted the case to the jury for decision. Accordingly, even in a diversity case, such as the case at bar, where state law supplies the substantive rule of decision, a Rule 50(b) motion presents a question of federal law., *Rotondo v. Keene Corp.,* 956 F.2d 436, 438 (3d Cir.1992), *citing*

1. This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. The plaintiffs are New Jersey citizens, defendant Mollers NA is a Delaware corporation, and defendant Moellers Germany is a foreign citizen. The amount in controversy exceeds $50,000 exclusive of interest and costs. In addition, it should be noted that Delaware law governs this case.

2. The Mollers PFS palletizer is a bag-stacking device. At the General Chemical Corporation plant in Claymont, Delaware, the Mollers PFS palletizer was used to stack 50 lbs. and 100 lbs. bags of chemicals on wooden pallets. The basic operation of the Mollers PFS palletizer is quite simple. The machine inserts an empty wooden pallet into the stacking area. The slip sheet placer mechanism of the palletizer picks up a sheet of cardboard and carries it to the stacking area. The slip sheet placer then returns to its initial position and the machine begins stacking bags of chemicals on the pallet. Once the pallet is loaded with bags, the pallet is discharged from the stacking area and the process is repeated. During the operation of the palletizer, two large metal arms move up and down at certain intervals. The arms remain elevated and motionless for a period of 19 seconds while a new pallet is loaded onto the stacking area. When the slip sheet placer returns to its initial position, the arms descend.

*Woods v. National Life & Acc. Ins. Co.,* 347 F.2d 760, 768 (3d Cir.1965).

Rule 50(a)(1) of the Federal Rules of Civil Procedure "articulates the standard for the granting of a motion for judgment as a matter of law." Fed.R.Civ.P. 50(a) advisory committee's note. In pertinent part Rule 50(a)(1) states:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). If the court denies a party's Rule 50(a) motion for judgment as a matter of law at the close of all the evidence, Rule 50(b) permits that party to renew its motion for judgment as a matter of law within 10 days after the entry of judgment. According to the text of Rule 50(b), the justi-fication for permitting the renewal of a motion for judgment as a matter of law under Rule 50(b) is that in denying the party's Rule 50(a) motion "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Fed.R.Civ.P. 50(b).[3]

■■ A post-verdict motion for judgment as a matter of law pursuant to Rule 50(b) should be granted only when there is no legally sufficient basis for a reasonable jury to have found for the non-moving party. In considering a post-verdict motion for judgment as a matter of law pursuant to Rule 50(b), a reviewing court "must view the evidence in the light most favorable to the non-moving party." *Keith v. Truck Stops Corp. of America,* 909 F.2d at 745; *see also Kelly v. Matlack, Inc.,* 903 F.2d 978, 981 (3d Cir. 1990) (same). The reviewing court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the

---

3. "[P]rior to the 1991 amendments to the Federal Rules of Civil Procedure, a motion under Rule 50(b) was called a motion for a judgment notwithstanding the verdict [JNOV] while a motion under Rule 50(a) was called a motion for directed verdict. The amendments adopted the common terminology of 'judgment as a matter of law' for both subsections (a) and (b) of Rule 50." 5A James Wm. Moore, *et al., Moore's Federal Practice* ¶ 50.07[2] at p. 50–74 (1993). The Advisory Committee's Note reveals that the 1991 amendments to Rule 50 were not merely cosmetic, but rather, were designed to effectuate a two-fold change. First, by adopting the nomenclature of "judgment as a matter of law" for both Rule 50(a) and Rule 50(b) motions, the amendments codify the rule announced in judicial decisions "that held that the standards for the granting of a judgment n.o.v. were identical to those for direction of a verdict." 5A Moore, *et al., supra,* ¶ 50.07[2] at pp. 50–74 to 50–75; *see also* Fed.R.Civ.P. 50(a) advisory committee's note ("the change enables the rule to refer to preverdict and post-verdict motions with a terminology that does not conceal the common identity of two motions made at different times in the proceeding"). Second, the amendments overrule a line of cases which had held that a motion at the close of all the evidence under Rule 50(a) was not an absolute prerequisite to maintaining a post-verdict motion under Rule 50(b). *See* Fed.R.Civ.P. 50; *see also* 5A Moore, *et al., supra,* ¶ 50.08 at p. 50–83 (explaining that under current version of Rule 50 "a motion for judgment as a matter of law made after the verdict cannot be entertained unless the moving party requested judgment as a matter of law prior to the submission of the case to the jury by moving for such a judgment at the close of all of the evidence."). It should be noted the 1991 amendments to Rule 50 do not alter the law in the Third Circuit because it has always been the law in the Third Circuit that (1) the standard for granting a Rule 50(a) motion at the close of the evidence is identical to the standard for granting a Rule 50(b) motion after the verdict, *Keith v. Truck Stops Corp. of America,* 909 F.2d 743, 744–45 (3d Cir.1990) ("A court uses the same standard in passing on a motion for a directed verdict as it uses in considering a JNOV motion...."); (2) a Rule 50(a) motion at the close of the evidence is required for the court to entertain a Rule 50(b) motion after the verdict, *Keith,* 909 F.2d at 744 ("As a preliminary matter, we note that the record in this case does not disclose that defendant made a directed verdict motion at the close of all the evidence, a prerequisite to our consideration of the issue of the sufficiency of the evidence."); *see also Mallick v. International Brotherhood of Electrical Workers,* 644 F.2d 228, 233 (3d Cir.1981) ("It is a firmly entrenched rule that a court may grant a motion for judgment notwithstanding the verdict only when the moving party formally renewed its motion for a directed verdict at the close of all the evidence."). Accordingly, case law in the Third Circuit antedating the 1991 amendments to Rule 50 is still valid.

light most favorable to him." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.1991) *reh'g, en banc, denied,* 1991 U.S.App. LEXIS 16758 (3d Cir.1991), *appeal dismissed w.o. opinion,* 947 F.2d 939 (3d Cir.1991). If " 'the record contains the minimum quantum of evidence from which a jury might reasonably afford relief," *Keith,* 909 F.2d at 745, *quoting Smollett v. Skayting Dev. Corp.,* 793 F.2d 547, 548 (3d Cir.1986), then the reviewing court must deny the motion. Thus, "[w]here there is sufficient conflicting evidence, or insufficient evidence to conclusively establish the movant's case, judgment as a matter of law after the verdict should not be awarded." 5A Moore, *et al., supra,* ¶ 50.07[2] at p. 50–78. The reviewing court should not grant a judgment as a matter of law merely because its view of the evidence differs with that manifest in the jury's verdict. Such action on the part of the reviewing court would constitute a usurpation of the jury's province as factfinder. *Newman v. Exxon Corp.,* 722 F.Supp. 1146, 1147 (D.Del.1989), *affirmed w.o. opinion,* 904 F.2d 695 (3d Cir.1990) ("Although a court in viewing the evidence of record may have reached a different conclusion from that reached by the jury, that alone is not reason to enter judgment n.o.v.").

■ Application of these principles to the case at bar militates against the imposition of judgment as a matter of law. Plaintiffs' primary theory of recovery was that the defendants' PFS palletizer was defectively designed. The defendants contend that there was insufficient evidence in the record for a reasonable jury to make such a finding of defective design. In support of their contention, the defendants point to the various safety features of the PFS palletizer and its heretofore unblemished safety record of 570,-000 hours of actual operating time without a single mishap. The PFS palletizer has two methods for emergency shut down in the event of an accident. First, the equipment operator, stationed at a distance from the PFS palletizer in the control room, can de-energize the machine by depressing the emergency stop button on the control panel. Second, any person standing near the palletizer can de-energize the palletizer by inserting the safety pin into a hole located at the base of the palletizer. In the event that the safety pin is not readily accessible, a ferrous metal object, such as a wedding band or a coin, can be placed near the vicinity of the hole to de-energize the palletizer. The PFS palletizer at the General Chemical Corporation plant in Claymont, Delaware, also was installed with various warning signs, guard rails, and painted caution lines. Workers and maintenance employees were also given instruction on the operation of the palletizer and were required by the Claymont, Delaware plant's work rules to never place themselves in the way of moving parts of an energized machine. Finally, the defendants' expert, Mr. Jack Raymus, testified that the PFS palletizer is a safe machine and that the back of the palletizer creates a natural barrier which effectively obstructs a person from placing himself in the path of the palletizer's large moving arms.

The plaintiffs contend that these safety features of the PFS palletizer are defective. Plaintiffs' experts, Mr. Harry Eiermann and Dr. Stephen Wilcox, testified that these safety features suffer from a fundamental flaw. All of the above safety features are operator dependent. Accordingly, their effectiveness is conditioned upon the performance of people. These safety features do not take into account inherent human limitations such as inattentiveness, fatigue, and habituation.[4] Given the natural limitations of people, the only way to avoid accidents is to guard the moving arms of the palletizer by surrounding them with a cage barrier, such as that supplied on the German version of the PFS palletizer, or by employing an interlock guard. Plaintiffs' experts further testified that this conclusion is consistent with the first rule of safety in design, namely, that whenever possible, all moving parts should be guarded. In support of this contention, Mr. Harry Eirmann read to the jury an

---

4. Dr. Wilcox testified that "habituation" is the process by which persons who are familiar with a piece of machinery gradually lose their fear of that piece of machinery and begin to take risks with that machinery that the neophyte would not. *See* Excerpts from the Direct Examination of Dr. Wilcox, D.I. 115 at B–12.

excerpt from a bulletin entitled, "Safety Subjects," published by the United States Department of Labor, Division of Labor Standards in 1944. In pertinent part, the bulletin states:

> Positive mechanical means of eliminating machine hazards should be applied wherever possible and to the maximum extent possible. One commonly encounters the attitude that it is sufficient to guard a machine so that an operator faithfully obeying carefully-worded-out rules of safe operation can escape injury. This attitude is wrong and is responsible for a heavy proportion of the injuries connected with machine operation. Every uncontrolled hazard, however remote, will produce its quota of injuries and even the most careful operator will at times do the wrong thing or fail to take some necessary precaution.

Excerpts from the Direct Examination of Mr. Harry Eirmann, D.I. 113 at 34. Dr. Stephen Wilcox also criticized the defendants' contention that the back of the palletizer creates a natural barrier which prevents a person from being struck by the moving arms. Dr. Wilcox testified that this natural barrier was only 43 inches high and that the average person is capable of leaning over it. Excerpts from the Direct Examination of Dr. Stephen Wilcox, D.I. 115 at B–28.

■ Given the conflicting evidence and divergent expert testimony that was before the jury, it would be improper to grant judgment as a matter of law for the defendants. If this Court were the trier of fact, the result in the present case might well have been different. But it is not the duty of this Court in entertaining a motion for judgment as a matter of law to supplant its view of the evidence for that of the jury. *Newman,* 722 F.Supp. at 1147. The jury's verdict must stand if viewing the evidence in the light most favorable to the nonmovant, a reasonable jury could have entered a verdict in favor of the nonmovant. The Court holds that the evidence was sufficient to sustain the jury's verdict. Accordingly, defendants' motion for judgment as a matter of law will be denied.

## B. DEFENDANTS' MOTIONS FOR NEW TRIAL AND REMITTITUR

■ Federal Rule of Civil Procedure 50 permits a party who moves for judgment as a matter of law to move in the alternative for a new trial. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 253, 61 S.Ct. 189, 195, 85 L.Ed. 147 (1940) ("If alternative prayers or motions are presented, as here, we hold that the trial judge should rule on the motion for judgment. Whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds for his decision."); *see, e.g., Roebuck v. Drexel University,* 852 F.2d 715, 735 (3d Cir.1988); *Raudenbush v. Baltimore & Ohio R.R.,* 160 F.2d 363, 369 (3d Cir.1947) (per Rodney, J. sitting by designation); *see also* 5A Moore, *et al., supra,* ¶ 50.13[1] at p. 50–112. Even in a diversity case in which state law supplies the substantive rule of decision, federal law governs the standard for granting a motion for a new trial. *Vizzini v. Ford Motor Co.,* 569 F.2d 754, 760 (3d Cir.1977). Rule 59(a) of the Federal Rules of Civil Procedure supplies that standard. Rule 59(a) states that, "A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted at law in the courts of the United States." Fed. R.Civ.P. 59(a). Among the firmly established grounds for granting a new trial at common law are that the jury's verdict is against the weight of the evidence and that the jury's damage award is excessive. *Montgomery Ward & Co.,* 311 U.S. at 251, 61 S.Ct. at 194; *see also Schreffler v. Board of Ed. of Delmar School District,* 506 F.Supp. 1300, 1306–08 (D.Del.1981). The decision of whether or not to grant a new trial is committed to the sound discretion of the trial court. In the present case, the defendants have moved for a new trial on the grounds that the jury's verdict is against the weight of the evidence and that the jury's damage award is excessive. In the absence of a grant of a new trial, the defendants seek in the alternative an order for remittitur.

## 1. THE JURY'S VERDICT IS NOT AGAINST THE WEIGHT OF THE EVIDENCE

 In determining whether the jury's verdict is against the weight of the evidence, the trial court "should view the verdict in the overall setting of the trial; considering the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." 6A Moore, *et al., supra,* ¶ 59.08[5] at p. 59–150. Although the grant of judgment as a matter of law may be inappropriate because the jury's verdict is supported by sufficient evidence, the court may, nonetheless, set aside the verdict on the ground that the verdict is against the weight of the evidence. *Roebuck v. Drexel University,* 852 F.2d at 737; *see also Schreffler,* 506 F.Supp. at 1306. Simply stated, the trial court's duty is to uphold the jury's verdict unless to do so would constitute a miscarriage of justice. *Schreffler,* 506 F.Supp. at 1306–07.

 The defendants' contention that the jury's verdict is against the weight of the evidence is two-fold. First, the defendants assail the jury's finding that the decedent was only 25% comparatively negligent as against the weight of the evidence. The defendants argue that the decedent intentionally placed himself in harm's way by leaning into the palletizer to observe the slip sheet placer mechanism. D.I. 109 at 114. The defendants claim that in so doing the decedent was at least 51% negligent in causing his demise and therefore, the plaintiffs are barred from recovering against defendants under Delaware law.[5] Second, the defendants argue that the jury ignored the uncontroverted evidence that Mr. Gerdeman's failure to enforce the plant safety rules and to follow the plant procedure of de-energizing the palletizer before allowing repair work to be performed was an intervening proximate cause of the decedent's death. The uncontroverted evidence before the jury demonstrated that Mr. Gerdeman asked the decedent to examine the PFS palletizer to determine why the slip sheet placer mechanism was moving erratically. Mr. Gerdeman did not order the equipment to be de-energized in accordance with plant procedure; nor did Mr. Gerdeman attempt to insert the safety pin or other ferrous metal object into the safety shut-down device when he observed the decedent lean over and place his head into the PFS palletizer. Instead, Mr. Gerdeman stood by idly.

 The plaintiffs counter that (1) the weight of the evidence before the jury supports its finding that the decedent was only 25% contributorily negligent; and (2) Mr. Gerdeman's conduct was reasonably foreseeable to the defendants and as such Mr. Gerdeman's conduct did not constitute an intervening proximate cause of the decedent's death. D.I. 117 at 17–21. In support of their position, plaintiffs rely on the direct examination testimony of their expert, Dr. Wilcox, and the cross examination of defendants' expert witness, Mr. Jack Raymus. Dr. Wilcox repeatedly stressed that the decedent's death was the result of predictable human behavior that was reasonably foreseeable to the defendants and should have been considered by the defendants in designing the palletizer. Excerpts from the Direct Examination of Dr. Wilcox, D.I. 115 at B–37 to B–41. Dr. Wilcox also testified that Mr. Gerdeman's inaction was "fairly typical behavior," and was likewise reasonably foreseeable to the defendants. *Id.* at B–41. On cross examination, defendants' expert, Mr. Jack Raymus, testified that the use of a mechanical barrier, such as that found on the German version of the PFS palletizer, to shield the arms of the machine was indeed

---

5. Under Delaware law, a plaintiff or his representative may not recover damages in an action for negligence if the plaintiff's comparative negligence is 51% or greater. Title 10 of the Delaware Code § 8132 provides that "[i]n all actions brought to recover damages for negligence ... the fact that the plaintiff may have been contributorily negligent shall not bar recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff." 10 *Del.C.* § 8132.

mechanically feasible. Excerpts from the Cross Examination of Mr. Jack Raymus, D.I. 115 at D–9 to D–10. In addition, Mr. Raymus testified on cross examination that in designing a machine, a manufacturer must take into account human limitations and whenever possible the manufacturer must remove all hazards from the product. *Id.* at D–11 to D–14.

■ Given the conflicting evidence before the jury, it is not evident that the jury reached a seriously erroneous result. Although this Court's view of the evidence may differ from that of the jury, that is not the touchstone for granting a new trial. 6A Moore, *et al., supra,* ¶ 59.08[5] at pp. 59–148 to 59–149. The test is whether the jury's verdict constitutes a miscarriage of justice. On the record before this Court, this standard has not been satisfied.

## 2. THE JURY'S VERDICT IS EXCESSIVE

■ As stated above, a trial court may grant a new trial when in its sound discretion, it concludes that the jury's damage award is excessive. The question of whether or not the jury's verdict is excessive is governed by federal law. *Kazan v. Wolinski,* 721 F.2d 911, 913 (3d Cir.1983). The test promulgated by the Third Circuit to determine whether the jury's damage award is excessive is whether the damage award "shock[s] the judicial conscience." *Gumbs v. Pueblo Int'l, Inc.* 823 F.2d 768, 771–72 (3d Cir.1987). In *Gumbs,* the Third Circuit commented that "[a] jury has very broad discretion in measuring damages; nevertheless a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded." *Id.* at 773.

■ If the trial court determines that the jury's damage award is excessive, the trial court may in the exercise of its sound discretion grant a new trial, or, "grant the plaintiff an election to remit a stated portion of the amount or submit to a new trial." 6A Moore, *et al., supra,* ¶ 59.08[7] at p. 59–187. If the trial court grants the plaintiff an election to remit a stated portion of the damage award, the remittitur must not cause the damage award to "fall below the maximum amount which the jury could reasonably find." *Gumbs,* 823 F.2d at 771–72.

■ Although federal law governs the question of whether a jury's verdict is excessive, "a court sitting in diversity may look to other awards condoned by the state whose substantive law governs." *Pruitt v. Suffolk OB–GYN Group, P.C.,* 644 F.Supp. 593, 596 (E.D.N.Y.1986); *see also Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 750 (2d Cir.1984) ("In determining whether an award is so excessive as to shock the judicial conscience, we look, as a court sitting in diversity, to other jury awards condoned by the courts of the state whose substantive law governs the rights of the parties...."). In the present case, the jury awarded $937,-500.00 in damages pursuant to Delaware's wrongful death statute, codified at 10 *Del.C.* § 3724(d).[6] The parties agreed by stipulation that the special damages sustained by the plaintiffs totalled $115,346.00. These special damages consisted of $112,267.00 in economic losses, $2,000.00 in funeral expenses, and $1,079.00 in medical expenses. Thus, $822,154.00 of the jury's gross damage award consisted of compensatory damages for the mental anguish suffered by the decedent's three children ($937,500.00 − $115,-436.00 in special damages = $822,154.00 in damages for mental anguish). The jury's gross damage award was then reduced by the Court to $703,125.00 to reflect the jury's

---

6. Title 10 of the Delaware Code § 3724(d) provides a list of factors the jury may consider in fashioning a damage award for wrongful death. Those factors are:

(1) Deprivation of the expectation of pecuniary benefits to the beneficiary or beneficiaries that would have resulted from the continued life of the deceased;

(2) Loss of contributions for support;

(3) Loss of parental, marital and household services, including the reasonable cost of providing for the care of minor children;

(4) Reasonable funeral expenses not to exceed $2,000.00

(5) Mental anguish resulting from such death to the surviving spouse and next of kin of such deceased person....

10 *Del.C.* § 3724(d)(1)–(5).

finding that the decedent was 25% comparatively negligent. The $703,125.00 judgment represents the aggregation of $86,509.50 in special damages (75% × $115,346.00) and $616,615.50 in damages for mental anguish (75% × $822,154.00). Thus, the bulk of the jury's damage award was for mental anguish. Indeed, the amount of damages for mental anguish exceeded 7 times the amount of the special damages awarded ($616,615.50 in mental anguish damages ÷ $86,509.50 in special damages = 7.12772). This Court finds such an award shocking to its judicial conscience.

This conclusion is further supported by the peculiar facts of the present case. At the time of this tragic accident, the decedent and his former wife, Ms. Faye J. Mills, were divorced. Ms. Faye J. Mills retained custody of the children. Thus, the children visited the decedent on weekends and holidays. Although the Court does not question the love and affection the Garrison children have for their late father, the Court views the damage award for mental anguish under these circumstances to be excessive.

In the case of *Daniels v. Daniels*, C.A. No. 83C–FE–110, 1990 WL 74338, 1990 Del.Super. LEXIS 190, slip op. (Del.Super. May 16, 1990), the Delaware Superior Court, after a bench trial on the issue of damages in a wrongful death action, awarded one of the plaintiffs, Ms. Josephine J. Daniels–Wilson, $130,000.00, for the mental anguish she suffered as a result of the death of her father. Ms. Daniels–Wilson was approximately three weeks short of her seventeenth birthday at the time of her father's death. In the *Daniels* case, however, the decedent and his wife were not divorced. In the present case, the adjusted jury award for mental anguish is $205,538.50 per child. Thus, the adjusted jury award for mental anguish per child in the present case exceeds the award in *Daniels* by $75,538.50 ($205,538.50 − $130,000.00 = $75,538.50). Stated differently, the adjusted award for mental anguish per child in the present case is in excess of 158% of the award for mental anguish in *Daniels*.

■ In view of the Superior Court's wrongful death award for mental anguish in *Daniels*, the Court holds that the adjusted

jury award in the present case is so excessive as to shock the judicial conscience. In the present case, the plaintiffs are entitled to a maximum judgment of $379,009.50. This sum is the aggregate of the $86,509.50 of special damages (75% × $115,346 = $86,-509.50) plus damages for mental anguish in the amount of $292,500.00 (or $97,500.00 per child). The $97,500.00 of mental anguish damages per child is in line with the award in *Daniels*. Indeed, a reduction of the $130,-000.00 award for mental anguish in *Daniels* to reflect the jury's finding of 25% comparative negligence on the part of the decedent, would put the mental anguish award at $97,-500. Moreover, this Court finds this proposed judgment generous given the peculiar facts of the present case, namely that the decedent and his wife were divorced and that the children visited the decedent only on weekends and holidays.

Accordingly, an order will be entered giving the plaintiffs the election of remitting $324,115.50 of the adjusted jury award, or, in the alternative, of submitting to a new trial. Because the issues of liability and damages are so inextricably intertwined as to be incapable of bifurcation, should the plaintiffs elect the new trial, the trial will not be confined to the issue of damages. Plaintiffs must make such election by a date certain set forth in the Court's order. *Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.... Here the question of damages ... is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial."); *see also Vizzini v. Ford Motor Co.*, 569 F.2d at 760–61 (same). Thus, any new trial in this case, will concern both the issues of liability and damages.